## HUNT v. DUNLAP et al.   (No. 8292.)

(Court of Civil Appeals of Texas. Galveston. Jan. 24, 1923.)

1. Appeal and error ⬳733—Assignments of error held too indefinite to be considered on appeal.

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 1612, requiring an appellant to file assignments of error specifying the grounds on which he relies, and rules 23 to 31 of the Court of Civil Appeals (142 S. W. xii, xiii), requiring strict compliance with the statute, in an appeal from a decree for defendants in a suit by a railway engineer to enforce certain seniority rights in a classification of engineers, two assignments of error that the court erred in its judgment, and three others asserting that the pleadings and proof showed certain facts, which, if undisputed, might have entitled ap-

pellant to judgment, and not asserting a lack of evidence to support the judgment or that the judgment was against the weight of evidence, were too indefinite to be considered on appeal.

**2. Trade unions ⬅️4—Refusal of mandatory injunction to restore member of labor union to seniority rights held not error.**

Where, by an agreement of two railroad labor unions, all engineers of the unions were put under the jurisdiction of one union, with a provision that all engineers who did not hold rights in yard service would be given such rights effective on a certain date, but listed as younger than those on a certain switch engineers' list, in view of a decision of an executive committee of union officials that a road engineer who had yard rights and who was older in service than a yard engineer had seniority over the yard engineer, in a suit by the yard engineer for a mandatory injunction against union officials to be restored to his seniority rights, refusal of the writ was not error.

Appeal from District Court, Anderson County; W. R. Bishop, Judge.

Suit by W. D. Hunt against R. C. Dunlap and others. From judgment for defendants, plaintiff appeals. Affirmed.

Wm. H. Atwell, of Dallas, for appellant.

Campbell, Greenwood & Barton, of Palestine, for appellees.

LANE, J. [1] This suit was brought by appellant, W. D. Hunt, against the Brotherhood of Locomotive Engineers, Brotherhood of Locomotive Firemen and Enginemen, referred to hereafter as B. of L. E. and B. of L. F. and E., respectively, T. E. Lord, W. S. Carter, W. S. Stone, and other officers, agents, and members of said organizations or associations, to recover damages, and for a mandatory injunction commanding said orders and their said officers and agents to restore him to his seniority rights, of which he had theretofore, by said orders, officers, and agents, been deprived. The plaintiff alleged:

"That he had been in the railway business as fireman and switch engineer for about 25 years. That in 1902 he came to Palestine and went to work for the International & Great Northern Railway in his said position. That he had never had any charges filed against him, and had never been discharged from any railway service in his life, and that he was thoroughly satisfying and satisfactory to the railway company and to the receiver, and that he was giving satisfactory service, and that there had never been any difference or disagreement between him and his employer. That his employer was not objecting in any way whatsoever to him, or to his service. That he was a member of the Brotherhood of Locomotive Firemen and Enginemen, and had so been for more than 20 years. That the Brotherhood of Locomotive Firemen and Enginemen was a voluntary association with a right to do business in Texas, with its head office and place of business in Cleveland, Ohio. That the defendant Brotherhood of Locomotive Engineers was likewise a voluntary association with the right to do business in Texas, and with its head office and place of business in Cleveland, Ohio. That the defendants W. S. Carter and W. S. Stone were respectively the heads of said organizations. That the defendants M. E. Montgomery and C. V. McLaughlin were, respectively, the assistant chief and the vice president of said organizations. That the defendant R. C. Dunlap is the general chairman of the grievance committee of the B. of L. F. & E. for the I. & G. N. Railway, and an agent of said brotherhood. That the defendant B. P. Myers is the master mechanic of the I. & G. N. at Palestine. That the defendant M. Milton is the secretary and agent of the local lodge of B. of L. E. at Palestine, and that the defendant C. R. Wahlers is the local chairman and agent of the B. of L. F. & E. at Palestine. That the defendant T. E. Lord is the General Chairman of the Grievance Committee of the B. of L. E. That the I. & G. N. Railway Company, through its receiver, has an agreement with and uses union men, and that such union men are members of the B. of L. E. and B. of L. F. & E., and that it works and employs as engineers and firemen in its switchyards at Palestine only such men as belong to said organizations. That since the year 1915, and particularly during the years 1920 and 1921, the receiver and the railway had and kept an agreement with the said two organizations of railway operatives, a copy of which agreement was attached to the plaintiff's petition. That the railway and its receiver and agent and employees are guided and controlled in the matter of its employees and hours and seniorities by said agreement between the railway and its receiver and the said unions, and that the said railway and its receiver are guided and controlled as to seniorities of its engineers and firemen and switch engineers by the orders of the said union organizations.

"That prior to 1913 the B. of L. F. & E. was the union which furnished the firemen on the I. & G. N. in the Palestine division, and the engineers who operated switch engines in the switchyards of said railway in Palestine. That the B. of L. E., prior to 1913, was the union which furnished engineers on the locomotives used on the I. & G. N. Railway on the road and outside of the switchyards. That in 1913 these two unions made a joint agreement whereby the jurisdiction over switch engineers, effective July 1, 1913, was to be turned over to the B. of L. E. That simultaneously with such turning over the B. of L. F. & E. was to furnish to the B. of L. E. a list of switch engineers in the order of their seniority, one man for each job. That this joint agreement was to become effective upon the American railways as such different railway systems adopted it, and that it in fact became effective and operative on the I. & G. N. Railway in October, 1918. That such joint agreement so effective was a part of the agreement between the I. & G. N., through its receiver, and the said unions, B. of L. F. & E. and B. of L. E., and was a vested right of the appellant, and a property right belonging to him and fixing his status, and for which he had given a consideration, and that such agreement could

not be abrogated or changed without his consent, which he had not given. That prior to such agreement of 1913, and prior to its adoption by the receiver of the I. & G. N. in 1918, the B. of L. E. had no jurisdiction or supervision over the B. of L. F. & E.

"That prior to 1913, and all of the time from then up to October, 1918, he was operating a switch engine in the Palestine division of said railway, and as such switch engineer and firemen he had the right to go out upon the road at a higher and increased compensation, but that he gave away such right for and in consideration of the right to become what was known as a 'fixture.' That at the time of the taking effect of said joint agreement on the I. & G. N. in October, 1918, he was a fireman, and there was offered to him by the said unions, as a condition precedent to the taking of jurisdiction over the Palestine switchmen by the B. of L. E., the right to become a 'fixture' in said switchyards, who could not be 'bumped,' or displaced, by any road engineer who might conclude to quit the road and come into the switchyards, and that such offer was made to him in writing by said unions, and that he accepted such privilege and right, and became sixth in a list of 12 'fixtures,' who could not be displaced by road engineers. That being sixth on said 'fixtures' left but five who were ahead of him in the right to have positions in the switchyards with advantageous hours, and that as a result thereof he was performing his eight hours per day in the daytime. That such 'fixture' agreement and contract and understanding was approved by the Grand lodge officers, and by the general chairman of the two unions, and that as a result thereof he was working at a day position in said yards from 8 o'clock in the morning to 4 o'clock in the afternoon. That such hours were suited to his age and physical condition, and that he was giving thorough satisfaction to his employer and to his associates, and that no one was objecting or complaining, but that on November 5, 1920, without any cause whatsoever, but merely for the purpose of giving the position which he held to road engineers, giving their names, who wished to have switchyard positions, the unions caused the appellant to be displaced or 'bumped' from said position to night positions, when it was necessary for him to go to work at midnight and work until 8 o'clock in the morning. That such hours of labor were quite undesirable, that they were difficult and hazardous, and, since the appellant was about 50 years of age, and nervous and subject to stomach disorders, that the same had interfered with his health and sleep, and had greatly damaged him in seriously and irreparably undermining his health. That it was necessary that he have regular hours of sleep and that he have such sleep in the nighttime, and that the midnight position broke into his hours of rest and injured his health. That the midnight position was of less pecuniary value, receiving much less pay, and that the loss was approximately $40 a month. That the railway and its receiver were quite willing and ready to replace the appellant in his original position, and would do so if allowed to do so by the said unions, but that the said unions persisted in an unjust position and attitude to prevent the appellant from keeping and having his said advantageous position as a 'fixture.'

That the said unions had ordered the railway to displace the appellant with said road engineers. That his right to become and remain a 'fixture' over the said number was purchased by him, and was a right vesting in him from the consolidation of his union with the B. of L. E., and by his giving over his right to go on the road, and that there was no power or authority to divest him of said property right. That he was a man of family, owning his own home and residence in Palestine. That he knew no other business than said railway business. That he had spent nearly 25 years in that business, and that the right to remain in the employ of said railway so long as it was satisfactory to said railway in the said business was invaluable to him. That when said displacement and injustice took place he appealed to the councils of his unions as provided by the constitution and by-laws of the said unions, but that the said unions had fraudulently and purposely refused to undo the wrong or to replace him, but had persisted and continued in their orders and determinations to deprive him of said property rights and of said position which he had earned and which was his."

Appellant asked for judgment for his damages up to the time of granting of an injunction, that he have a restraining order commanding the officers and agents of the two unions to restore him to the seniority which was his in said Palestine yard, and that they be required to certify such seniority to the defendant railway and its receiver, and that they be restrained from interfering with his seniority right in said yard, and that they be restrained from allowing any line engineer to come into said yard and from doing away with his seniority right as said "fixture," or in any way interfering with his employment.

The defendant answered, first, by general denial; second, that by the Chicago joint agreement all disputes thereunder were to be submitted to the two chief executives; that the grievances of the plaintiff had been submitted to the two general chairmen of the two unions, who composed the two chief executives, and that they had decided the matter adversely to the contentions and claims of the plaintiff; that, while it was true that appellant was sixth on the list of "fixtures," there were a large number of engineers on the I. & G. N. who had greater seniority rights than did appellant, and that they could exercise their seniority rights by coming into the yard.

The facts pertinent and material to the controlling question presented by this appeal are substantially as follows:

The two labor organizations or associations, the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen, met in joint convention in the city of Chicago in the year 1913, and entered into an agreement whereby jurisdiction over former enginemen was turned over to the order of Brotherhood of Locomo-

tive Engineers. The Chicago agreement was put in force on the I. & G. N. Railway on the 1st day of August, 1918, by the following agreement:

"In accordance with the terms of the Chicago joint agreement entered into between the B. of L. E. and the B. of L. F. & E., effective July 1, 1913, jurisdiction over switch engineers will be turned over to the B. of L. E. The B. of L. F. & E. will prepare a list of switch engineers in the order of their seniority, one man for each job. The list will be consolidated with the road engineers' seniority list (except 'fixtures' in yard service, who will be designated) and the men whose names appear on this switch engineers' list will be given date on the engineers' road seniority list as of date July 1, 1913.

"All road engineers who had seniority rights as road engineers prior to July 1, 1913, and who do not now hold rights in yard service will be given rights in yard service effective from that date, but they will be listed as yard engineers younger than the men whose names appear on the switch engineers' list turned over to the B. of L. E. by the B. of L. F. & E.

"All road engineers employed since July 1, 1913, who do not now hold rights in yard service, will be given rights in yard service effective from the date of their seniority as road engineers.

"It is understood that 'fixtures' in yard service will hold prior rights in yard service and shall not be displaced by road engineers during periods of business depression.

"After these seniority lists have been merged as above outlined, all temporary vacancies in yard service will be filled by men from the engineers' extra list. These lists of switch engineers, together with jurisdiction over switch engineers will be turned over to the B. of L. E. committee on or before October 15, 1918. [Signed] T. E. Lord, General Chairman, B. of L. E. [Signed] R. C. Dunlap, General Chairman, B. of L. F. & E.

"Approved: [Signed] M. E. Montgomery, Ass't Grand Chief, B. of L. E. [Signed] C. V. McLaughlin, Vice President, B. of L. F. & E."

Following the last-mentioned agreement, the Brotherhood of Locomotive Firemen and Enginemen turned over to the Brotherhood of Locomotive Engineers a list of switch engineers in the order of their seniority, one for each job in the Palestine switch yards, as provided in the first clause of said agreement as follows:

"1. L. Koel. 2. Bola Carr. 3. T. B. Tucker. 4. G. B. Hughes. 5. J. R. Martin. 6. W. D. Hunt. 7. W. H. Hughes. 8. F. L. Garner. 9. L. F. Ezell. 10. G. C. Reece. 11. J. L. Willard. 12. T. E. Sharpless."

These parties were to be given positions in the yard service with seniority rights, in the order named, and were to be classed as "fixtures" in accordance with the terms of said agreement. At the time this agreement was made appellant, Hunt, was a fireman and switch engineer in the Palestine yards, as he had been for about 20 years. One Par-

sons had entered the service of the railway company as a fireman and switch engineer prior to the time appellant had so entered into such service, and had been promoted to the position of road engineer, which position he was holding when he again entered the yard service. The I. & G. N. Railway Company had an agreement with the two labor organizations that in placing employees in positions it would be governed by the construction placed upon the laws of the order relative to seniority rights by the proper officers of this Brotherhood of Locomotive Engineers. On the 24th day of June R. C. Dunlap, General Chairman of the Palestine Brotherhood of Locomotive Firemen and Enginemen, wrote appellant, W. D. Hunt, the following letter:

"Dear Sir and Bro.: As formal transfer of the switch engines to the B. of L. E. will be necessary in the revisement of the agreement we desire to properly make up a switch engineer's seniority list. Please advise by return of this letter if you wish to be shown as switch engineer or not. You understand that if you elect to be listed as a switch engineer you cannot be bumped by a road engineer when cut off the road board. The oldest applicant will be listed as No. 1 on the list, and then you will be given the same relative standing as you now hold on the firemen's roster. Your right to service will be governed by the switch engineers' seniority list. You will hold your rights as fireman under the same rules as the road engineers when cut off and return to firing service.

"Do you wish to be a switch engineer?

"Write Yes or No: Yes.

"Be sure and sign your name here:

"W. D. Hunt, Fireman."

Hunt answered "Yes," and was placed in the yard service as a "fixture," with seniority rights as between himself and those in the list above set out in the order as named in said list. After being so placed he was displaced to give place to road engineer Parsons, who held rights in the yard service, by order of T. E. Lord, general chairman of the Brotherhood of Locomotive Engineers, and he was given a less desirable position in the yard service. Appellant protested such displacement, and insisted that, as Parsons was a road engineer, he was not, by virtue of the third section of the agreement hereinbefore set out, entitled to seniority rights in the yard service over him; R. C. Dunlap, general chairman of the local order of Brotherhood of Locomotive Firemen and Enginemen, agreed to the interpretation of such section made by Hunt, and insisted that by virtue of such section Parsons had no seniority rights over Hunt in the yard service. T. E. Lord, general chairman of the Brotherhood of Locomotive Engineers, who was by the last section of the agreement given jurisdiction over switch engineers, differed with Hunt and Dunlap, and held that, as Parsons had begun service as a

fireman in the yard service for the I. & G. N. Railway Company, and had been promoted to the position of road engineer, he still retained seniority rights in the yard service, and that such seniority right was not taken from him by the provision of said section 3 of the agreement, and insisted that only those who entered the service of the company as road engineers without having been promoted from a fireman in such service were excluded from taking the place of a "fixture," who had entered the service of the company in the yard, and that, as Parsons had acquired yard rights as a fireman and switch engineer prior to the rights acquired by Hunt, he had not lost such rights, and that he had seniority rights at the time of the agreement which were superior to those of Hunt. Article 2 of the Chicago joint agreement makes it the duty of W. S. Stone, grand chief engineer of the Brotherhood of Locomotive Engineers, and W. S. Carter, president of the Brotherhood of Locomotive Firemen and Enginemen, to pass upon such disputes as above mentioned, and it also provides that their joint ruling on such disputes shall be final. The disputes between Hunt and Dunlap on one side and T. E. Lord on the other, above mentioned, were submitted to W. S. Stone and W. S. Carter, and they held that the interpretation placed on the agreement by T. E. Lord was correct.

The trial court propounded to R. C. Dunlap the following question:

"In this article, it reads as follows: 'All road engineers who had seniority rights as road engineers prior to July 1, 1913, and who do not now hold rights in yard service, will be given rights in yard service effective from that date, but they will be listed as yard engineers younger than the men whose name appear on the switch engineers' list turned over to the B. of L. E. by the B. of L. F. and E.' 'And who do not now hold rights in yard service.' To whom does that refer?"

To which the witness answered as follows:

"Your honor, I would rather not answer that question, since it might place me in an embarrassing position."

T. E. Lord testified that up to the time of the agreement putting the Chicago joint agreement in force on the I. & G. N. Railway road engineers who had had no service in the switchyard did have rights in yard service, but by such agreement his rights were subrogated to those who were thereby made "fixtures" in the yard service, but that road engineers who had acquired rights in the yard service retained such right, and were not affected by said agreement; that the man who worked his way up held his rights in the yard, but he had to cease to be a road engineer before he could assert his rights in the yard service.

The witness Milton testified as follows:

"There was a difference in the construction between Mr. Dunlap and Mr. Lord and the two chief executives sustained Mr. Lord's contention. And the construction placed upon that Chicago joint agreement is binding upon every switch engineer upon the I. & G. N. Railroad, including Mr. Hunt."

The case was tried before the court without a jury, and judgment was rendered sustaining the judgment in favor of the defendants, and refusing the relief prayed for by the plaintiff. The plaintiff has appealed, and presents five assignments reading as follows:

"(1) The court erred in entering and rendering judgment herein for the defendants.

"(2) The court erred in refusing the relief prayed for by the plaintiff.

"(3) The court erred in entering judgment for the defendants because the pleadings and the proof showed that the plaintiff was serving his employer, the receiver of the I. & G. N. Railway Company, in an acceptable manner in a desirable position and that the defendants, other than the said receiver caused him to lose said position and place and that he was entitled to recover his damages for such action up to the time of the granting of the injunction prayed for.

"(4) The court erred in refusing to grant the injunction prayed for by the plaintiff because the facts pleaded by the plaintiff and the proof introduced thereunder showed that the wrongs of which plaintiff complained were not susceptible of an accurate, speedy, and complete remedy at law.

"(5) The court erred in entering judgment for the defendants except the receiver, because the same showed that this plaintiff was the member of a defendant labor organization which entered into an agreement and contract with the plaintiff concerning a position in the Palestine yards known as a 'fixture'; that in violation of such contract and agreement the said organization and its officers and members had caused the plaintiff to be displaced therefrom in violation of said agreement; that the plaintiff thereupon appealed to the councils of said organization for relief; that the said councils had refused to grant said relief; that said contract and rights thereunder was and were property; and that therefore there was no other place for the plaintiff to go except into court, and, having so presented his matters he was entitled to the relief for which he prayed."

Appellee objects to the consideration of any of appellant's assignments upon the grounds that all of them are too general in that they fail to point out definitely the error or errors sought to be complained of as required by article 1612 of Vernon's Sayles' Civil Statutes 1914, and by rules 23 to 31 (142 S. W. xii, xiii) made by the Supreme Court to apply to the Courts of Civil Appeals. We think these objections are well founded, and should be sustained.

By article 1612, Revised Civil Statutes, it is provided that the appellant shall file assignments of error, distinctly specifying the grounds on which he relies, and by rules 23 to 31 for the Courts of Civil Appeals strict

compliance with the provision of article 1612 is required.

In Ludtke v. Smith (Tex. Civ. App.) 186 S. W. 266; Glover v. Houston Belt & Ter. Railway Co. (Tex. Civ. App.) 163 S. W. 1063; Dunn v. Epperson (Tex. Civ. App.) 175 S. W. 837; Dallam County v. Supply Co. (Tex. Civ. App.) 176 S. W. 798; and Freidman v. Huntsville Cotton Oil Co. (Tex. Civ. App.) 177 S. W. 573—it was held that the Court of Civil Appeals has no authority to revise judgments of trial courts except on matters distinctly specified by assignments of error.

In Occidental Life Insurance Co. v. Montgomery (Tex. Civ. App.) 226 S. W. 750, the court said:

"The first assignment of error is as follows: 'The judgment rendered against the plaintiff in favor of the said intervener P. R. Montgomery, awarding said intervener the land in controversy, is contrary to law and evidence in this cause, and is not supported by same, but, on the contrary, was with plaintiff.' This assignment of error we consider to be clearly violative of the rules of this court because it is too general and fails to point out with any definiteness the error to which it is desired to direct the court's attention. Article 1612, Sayles' Rev. Civ. Statutes; Scanlon v. Railway Company, 45 Tex. Civ. App. 345, 100 S. W. 983; Branch v. Simons, 48 S. W. 41."

In Sample v. Drake, 224 S. W. 555, this court held the following assignment too general to call for a consideration by the court:

"The petition in this case shows clearly the relief sought by appellant. The evidence shows clearly that as between plaintiff and the defendants, Mrs. L. E. Lancaster and W. H. Lancaster, that said Mrs. L. E. Lancaster and W. H. Lancaster are primarily liable for the $1,250 indebtedness described in plaintiff's petition, and that as between plaintiff and said defendants said indebtedness is primarily secured by land belonging to said defendants in Wharton county, Tex., and is a primary lien on said land and a secondary lien on Jackson county land belonging to plaintiff."

None of the assignments of appellant specifically point out the error sought to be complained of with that certainty required by law, and the court rules hereinbefore cited. While the third, fourth, and fifth assert that the pleading and the proof showed certain facts which, if undisputed, might entitle appellant to judgment, there is no assertion that there was no evidence to support the judgment rendered or that the judgment rendered was so against the great weight and preponderance of the evidence as to render it clearly wrong.

It is so well settled by the decisions of the appellate courts of the state that assignments such as those of appellant should not be considered on appeal that the citation of further authorities is unnecessary. If, however, we were to consider the assignments we would not be prepared to reverse the judgment rendered.

[2] As heretofore shown, section 3 of the agreement under which appellant held the position of which he was deprived reads as follows:

"All road engineers who had seniority rights as road engineers prior to July 1, 1913, *and who do not now hold rights in yard service*, will be given rights in yard service effective from that date, but they will be listed as yard engineers younger than the men whose names appear on the switch engineers' list turned over to the B. of L. E. by the B. of L. F. & E." (Italics ours.)

A dispute arose between appellant and R. C. Dunlap, general chairman of the Brotherhood of Locomotive Firemen and Enginemen, on one side, and T. E. Lord, general chairman of the Brotherhood of Locomotive Engineers, on the other, as to who or what class of engineers were meant by the expression, "and who do not now hold rights in yard service." T. E. Lord testified that the engineers referred to were those only who had entered the service of the I. & G. N. Railway Company as engineers, and not those who had entered such service as firemen and switch engineers in the yard, and who had been promoted to the position of road engineers; that the last-named class did hold rights in yard service at the time the agreement was entered into, and were not deprived of such rights by said agreement, nor were they thereby deprived of their seniority rights in yard service, and that those who had entered the yard service as firemen and enginemen after said last-named class, and had become "fixtures" under the terms of said agreement held positions subject to be "bumped" to other positions in the yard service by said class. Appellant and Dunlap took issue with Lord, and insisted that the appellant was given seniority rights in the yard service over all road engineers, regardless as to the time they entered the service of the railway company or in what capacity. The points of differences were submitted by Lord and Dunlap to W. S. Stone, grand chief engineer of the Brotherhood of Locomotive Engineers, and W. S. Carter, president of the Brotherhood of Locomotive Firemen and Enginemen, who by article 2 of the Chicago joint agreement were constituted an executive committee to which such disputes should be submitted for final decision; they sustained T. E. Lord's interpretation of the agreement.

Engineer Milton testified, as heretofore shown, that the dispute between Lord and Dunlap as to the proper construction of the agreement was referred to the chief executives, and that they sustained the contention of Lord.

On the trial of the cause R. C. Dunlap was asked by the court the question: "Who was

meant by the expression in section 3 of the agreement, 'and who do not now hold rights in yard service?'" and he refused to answer. We are not prepared to say from the facts shown that the construction given to section 3 of the agreement by Lord and the two chief executives was an unreasonable construction, and under these circumstances we think the judgment of the trial court should be affirmed; and it is so ordered.

Affirmed.